STATE of Minnesota, Respondent,

v.

William Allen FRAZIER,
petitioner, Appellant.

No. C8–00–2230.

Supreme Court of Minnesota.

Aug. 29, 2002.

John M. Stuart, State Public Defender, Michael F. Cromett, Assistant Public Defender, Minneapolis, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, Alan Mitchell, St. Louis County Attorney, Duluth, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

William Allen Frazier pleaded guilty to one count of a controlled substance crime committed for the benefit of a gang. Despite his plea, Frazier asked the district court to sentence him without regard to the crime committed for the benefit of a gang statute, Minn.Stat. § 609.229 (2000). He argued that the statute, as applied, denies equal protection and due process under the federal and state constitutions. In support of his argument, Frazier presented data which he asserted indicated that section 609.229 has a disparate impact on the basis of race. The district court found that Frazier's data demonstrated that section 609.229 has a disparate impact on racial minorities. Nevertheless, the

court ultimately rejected Frazier's constitutional argument, finding that the statute survived constitutional scrutiny under Minnesota's active rational basis test. On appeal, the Minnesota Court of Appeals did not address whether Frazier's data demonstrated disparate impact, apparently accepting the district court's finding. However, the court of appeals concluded that the statute survived our active rational basis test. We affirm, but on different grounds.

Appellant William Allen Frazier is a black male and admits that he belongs to the New Breed Disciples, a criminal gang located in Duluth. The state alleged that on four separate occasions, Frazier sold crack cocaine to confidential reliable informants working with the Special Investigations Unit of the Duluth Police Department. The state charged Frazier with (1) one count of first-degree conspiracy to sell cocaine, in violation of Minn.Stat. §§ 152.021, subd. 1(1), and 152.096, subd. 1 (2000), (2) two counts of second-degree controlled substance crime in violation of Minn.Stat. § 152.022, subd. 1(6) (2000), and (3) two counts of third-degree controlled substance crime in violation of Minn.Stat. § 152.023, subd. 1(1) (2000). When charging Frazier with these offenses, the state alleged that these offenses were committed for the benefit of a gang in violation of Minn.Stat. § 609.229 (2000), a separate crime.

Frazier entered into a plea agreement with the state and pleaded guilty to one count of second-degree controlled substance crime committed for the benefit of a gang. The state then dismissed the remaining counts. At his sentencing hearing, Frazier moved the district court to sentence him without regard to section 609.229, which provides a mandatory minimum sentence for crimes committed for the benefit of a gang. He asserted that (1) the statute violates the due process and equal protection clauses of the federal and state constitutions and (2) under section 609.229, the Minnesota Sentencing Guidelines Commission (Guidelines Commission) lacks the statutory and jurisdictional authority to require a 12 month sentence enhancement for gang-related crimes.

In support of his sentencing motions, Frazier presented two arguments supporting his contention that section 609.229 offends the equal protection and due process clauses of the federal and state constitutions. First, Frazier argued that section 609.229 has a discriminatory impact on racial minorities. Frazier presented four kinds of data to support this argument. Frazier pointed to statistics from the Minnesota Gang Strike Force (Strike Force) which he argued indicate that about 92 percent of the 1,025 confirmed gang members in Minnesota are members of a racial minority. According to the Strike Force, 27 percent of confirmed gang members are white and 73 percent are minorities. Frazier arrived at the 92 percent figure by inferring that of the 281 confirmed gang members classified by the Strike Force as white, 202 are Hispanic and only 79 are white. He also used national level data to support his claim that minorities are more likely than whites to be gang members. Next, Frazier argued that data from the Guidelines Commission indicate that since 1994, only 10 percent of those sentenced under section 609.229 are white. Finally, Frazier presented data indicating that the incarceration rate of blacks is 12 times greater than their percentage of Minnesota's population. He did not offer any evidence regarding the strength and relevance of the data he presented to the court.

Frazier's second argument was that members of a racial minority who are convicted under section 609.229 are systemat-

ically given more severe sentences than individuals engaged in identical or similar conduct, but who are convicted under other statutes. More specifically, Frazier compared the crime committed for the benefit of a gang statute to Minnesota's RICO statute, Minn.Stat. §§ 609.901 et seq. (2000), and asserted that the state RICO statute does not establish an additional and consecutive sentence merely because the defendant is part of a criminal enterprise.

The state opposed Frazier's sentencing motions, contending that Frazier had failed to demonstrate that section 609.229 has a discriminatory impact on racial minorities. The state contested Frazier's assumption that not all of the individuals classified as white by the Strike Force are in fact white and questioned Frazier's use of national level data to bolster his claim regarding the racial make-up of gangs in Minnesota. The state also asserted that Frazier failed to demonstrate that the racial distribution of those incarcerated in Minnesota prisons or the racial distribution of those convicted of drug offenses in Minnesota was due to section 609.229. Finally, the state argued that even if the data did demonstrate that section 609.229 has a discriminatory impact, the statute survives scrutiny under the active rational basis test specified in *State v. Russell*, 477 N.W.2d 886, 889–90 (Minn.1991). Like Frazier, the state did not offer any evidence regarding the strength and relevance of the data presented by Frazier to the court.

The district court rendered its decision based on oral arguments of counsel and the parties' memoranda of law. With respect to Frazier's constitutional claim, the court found that section 609.229 has a racially disparate impact, noting that Frazier had "provided several statistics citing the number of minorities who have been sen-

tenced under the gang statute as compared to whites." The court then found that Frazier failed to meet his burden under Minnesota's active rational basis test as set forth in *Russell*. More specifically, the court found that the legislature chose to address the threat of gangs to the safety of citizens by enhancing the penalties of crimes committed for the benefit of a gang. The court concluded that there was a genuine and substantial reason for the statute.

The court also found that Frazier's comparison of the crime committed for the benefit of a gang statute with the state RICO statutes was misplaced because the RICO statutes are seldom used in prosecution and the Minnesota Sentencing Guidelines do not contain a severity level for such convictions. The court noted that Frazier failed to present evidence that RICO is used primarily against whites. With respect to Frazier's statutory claim, the court found that Minn.Stat. § 244.09, which authorizes the Guidelines Commission to promulgate the presumptive sentence duration for felony offenses, provides the statutory authority for the Guidelines Commission to require a 12–month enhancement for gang-related crimes. The court then sentenced Frazier to a 48–month executed term on the second-degree controlled substance conviction and an additional consecutive 12–month executed term on the crime committed for the benefit of a gang conviction.

Frazier appealed and the court of appeals held that section 609.229 does not offend the Equal Protection Clause of the Minnesota Constitution. *State v. Frazier*, 631 N.W.2d 432, 436–37 (Minn.App.2001). The court did not address whether Frazier's data indicated that section 609.229 had a disparate impact on racial minorities. The court applied the active rational basis

test set forth in *Russell* to evaluate the statute's constitutionality. *Id.* at 435.

In its analysis, the court of appeals identified certain evidence presented at a senate subcommittee hearing on the crime committed for the benefit of a gang bill. *See Hearing on S.F. 809 before the Senate Criminal Law Subcommittee*, 77 Minn. Leg. (April 4, 1991). Based on this evidence, the court of appeals concluded that the statute survives *Russell'* s active rational basis test because the legislature based its decision to enact section 609.229 on more than anecdotal evidence. 631 N.W.2d at 436. The evidence identified by the court is the following. First, an assistant attorney general testified that crimes committed for the benefit of a gang are more serious and deserve a greater penalty because of the impact on the victim and the community. Second, the legislature was presented with a number of newspaper articles reflecting the seriousness of the gang problem, including an article detailing the dismissal of felony charges in three cases in Hennepin County because witnesses were threatened by gang members. Third, a psychologist with the Minneapolis Public Schools testified that an increasing number of students are afraid to leave their homes at night because of street gangs and that he has observed young children flashing gang signs and has noticed gang insignias on student folders. The psychologist also testified that there was a recent death threat by a gang member against an assistant principal and that if nothing was done to respond to the influx of street gangs, gangs would become a permanent part of our community. Finally, the Minnesota President of the NAACP, a central Minneapolis resident, testified that residents in his neighborhood are living in fear because of gang intimidation.

The court of appeals also rejected Frazier's argument based on the RICO statute that the gang statute does not have a rational basis because it does not cover similarly situated organizations that do not have a "*common name or common identifying sign or symbol.*" The court found that Frazier had failed to identify a similarly situated criminal organization that may escape the gang statute's purview because it does not have a common name or identifying symbol. 631 N.W.2d at 436.

On appeal to our court, Frazier presents three claims under the Minnesota Constitution. First, he contends that section 609.229 violates the Equal Protection Clause of the Minnesota Constitution because the statute has a disparate impact on racial minorities. Second, he argues that section 609.229 violates the Equal Protection Clause of the Minnesota Constitution because it criminalizes conduct that is similar to the conduct penalized by Minnesota's RICO statute, but imposes a longer sentence. Third, he argues for the first time that section 609.229 violates freedom of expression and association protected by the Minnesota Constitution.

I.

We review challenges to the constitutionality of a statute under a de novo standard. *State v. Behl*, 564 N.W.2d 560, 566 (Minn.1997). Minnesota statutes are presumed to be constitutional and we exercise with extreme caution our power to declare a statute unconstitutional. *Id.* The party challenging the constitutionality of a statute bears the burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional. *Id.*

Frazier's first claim is that section 609.229 violates the Equal Protection Clause of the Minnesota Constitution because the statute has a disparate impact on racial minorities. In support of his argu-

ment, Frazier presents statistics from the Strike Force and the Guidelines Commission. He asserts that these data indicate that 27 percent of confirmed gang members are white, but only 10 percent of those convicted and sentenced under the statute are white; while 73 percent of confirmed gang members are members of a racial minority, but 90 percent of those convicted and sentenced under the statute are minorities.[1] Frazier argues that we should evaluate the statute under *Russell's* active rational basis test.[2]

The state argues that Frazier has not demonstrated that section 609.229 has a disparate impact on racial minorities. While acknowledging at oral argument that Frazier's data appear to indicate that the statute has a disparate impact, the state contends that the disparity (1) may not be statistically significant because of the small sample size and (2) can be explained by the fact that minorities are more likely than whites to be gang members. When specifically addressing the sample size, the state contends that the 39 convictions cited by the Guideline Commission's data was too small a sample to draw statistically reliable inferences regarding section 609.229's impact on racial minorities. The state also argues, based on federal equal protection standards, that disproportionate impact alone is not deter-

minative of invidious racial discrimination and that Frazier's equal protection claim fails because he has neither alleged nor presented evidence of discriminatory intent by the legislature. Finally, the state contends that the statute survives scrutiny under both the compelling interest and active rational basis tests. According to the state, there was ample substantive evidence submitted to the legislature to justify the gang statute under *Russell's* active rational basis test. The state asserts that the statute also satisfies strict scrutiny because preventing and curbing gang activity constitutes a compelling state interest and the statute is narrowly tailored to meet that interest.

The arguments presented by Frazier and the state raise the following three questions. First, does Frazier demonstrate that section 609.229 has a disparate impact on racial minorities such that he states a claim under Minnesota's Equal Protection Clause? Second, if Frazier states a cognizable equal protection claim, is the appropriate standard for evaluating this claim rational basis, active rational basis, or strict scrutiny? Third, if Frazier has a cognizable claim, does section 609.229 satisfy the proper equal protection standard?

■ An individual challenging a statute on equal protection grounds must demon-

---

1. The data Frazier offers in support of his disparate impact claim are in part different from the data he presented to the district court and the court of appeals. In his brief to this court, Frazier omits data regarding the racial distribution of the Minnesota population and national level data regarding the racial distribution of gang members. Instead, Frazier relies exclusively on the data from the Strike Force and the Guidelines Commission. With respect to the Strike Force data, Frazier no longer makes the assumption he made in his briefs to the lower courts that because only 79 of the 281 individuals classified by the Strike Force are white and the rest are Hispanic, 92 percent of confirmed gang members

in Minnesota are racial minorities. Thus, Frazier's description of the Strike Force data in his brief to this court now comports with the Strike Force's characterization of its data, which is that 27 percent of confirmed gang members are white and 73 percent are racial minorities.

2. Frazier argued in his brief that the constitutional validity of section 609.229 must be evaluated under the strict scrutiny standard, but at oral argument he requested that we evaluate the statute under *Russell's* active rational basis test.

strate that the statute classifies individuals on the basis of some suspect trait. 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.4 at 255 (3d ed.1999). Thus, the threshold question before us is whether Frazier's data demonstrate that section 609.229 creates a racial classification. The parties agree that on its face section 609.229 does not classify on the basis of race. Therefore, Frazier must demonstrate that the statute creates a racial classification in practice.

Frazier bases his disparate impact claim on a comparison of two sets of data. The Strike Force data consist of the number and racial distribution of confirmed gang members identified by law enforcement officials. The Guidelines Commission data consist of the number and racial distribution of individuals convicted under section 609.229. Frazier compares the racial distribution of those convicted under section 609.229 to the racial distribution of confirmed gang members in the Strike Force data. He then argues that because the racial distribution of those convicted under the statute deviates from the racial distribution of confirmed gang members, the statute, as applied, has a racially disparate impact.

While it is possible that Frazier could have a valid argument that section 609.229 has a racially disparate impact, we have difficulty accepting his argument based on the evidence he has presented. This is because we have several questions regarding the foundation for Frazier's data analysis and the reliability and validity of the data. First, it is possible that Frazier's data indicate that blacks are not disproportionately disfavored by section 609.229. According to the Strike Force, of the 1,025 confirmed gang members, 73 (7 percent) are Asian, 614 (60 percent) are black, 55 (5 percent) are American Indian, 2 are un-

known, and 281 (27 percent) are white. There is currently no separate category for Hispanics. According to the Guidelines Commission, between 1994 and 1998, 39 individuals were convicted of violating section 609.229. The population of convicted gang members consists of 4 whites (10.3 percent), 12 blacks (30.8 percent), 1 American Indian (2.6 percent), 21 Asians (53.8 percent), and 1 other (2.6 percent). Again, there is currently no separate category for Hispanics. On their face, these data show that 60 percent of confirmed gang members in Minnesota are black, but 30.8 percent of those convicted of violating section 609.229 are black. Because neither party presented any analysis regarding the meaning of Frazier's data, we cannot determine whether the aforementioned interpretation of the data has merit or whether Frazier's interpretation is more accurate. Therefore, without further analysis or explanation, we cannot, based on these data alone, conclude that blacks are disfavored by section 609.229.

A second question we have regarding the reliability and validity of Frazier's data is whether the Strike Force data are a reliable estimate of the racial distribution of the population of gang members in Minnesota. Frazier uses data derived from the Strike Force's Criminal Gang Pointer File, a statewide computer system that tracks gangs and the number of "confirmed gang members." A confirmed gang member is defined by the Strike Force as a person who has "been found guilty of a felony or gross misdemeanor," is "at least fourteen years of age," and meets at least three of the following ten-point criteria:

1. Admits gang membership or association;

2. Is observed to associate on a regular basis with known gang members;

3. Has tattoos indicating gang membership;

4. Wears gang symbols to identify with a specific gang;

5. Is in a photograph with known gang members and/or using gang-related hand signs;

6. Name is on a gang document, hit list, or gang-related graffiti;

7. Is identified as a gang member by a reliable source;

8. Arrested in the company of identified gang members or associates;

9. Corresponds with known gang members or writes and/or receives correspondence about gang activities; and

10. Writes about gang (graffiti) on walls, books, and paper.

Frazier has failed to present information from the Strike Force or any other source that enables us to evaluate whether these criteria are reliable indicators of gang membership.

Based on the above indicators of gang membership, the Strike Force has identified 1,025 persons as confirmed gang members. According to the Strike Force, these data do not represent the total number of gang members living or operating in the state of Minnesota, but only the "confirmed" members of gangs. Frazier has presented one page from a Strike Force report which indicates that the Strike Force identifies individuals as confirmed gang members based, in part, on their criminal history and certain gang-oriented behavior that is observed by law enforcement. But Frazier has not presented information from the Strike Force detailing the procedures and methods it used to identify the 1,025 confirmed gang members. Therefore, we have no basis for evaluating whether the racial composition of the population of confirmed gang members is a reliable estimate of the racial distribution of gang members in Minnesota or whether these data reflect the influence of other factors.

The fact that we cannot determine whether the Strike Force data are a reliable estimate of the racial distribution of gang members in Minnesota has significance for evaluating Frazier's disparate impact claim. Frazier compares the Strike Force and Guidelines Commission data and asserts that racial minorities are over-represented in the population of individuals convicted under section 609.229 compared to their representation in the population of confirmed gang members. But neither party presented any evidence regarding the reliability and validity of the Strike Force data. Therefore, we cannot evaluate whether deviations from the population of convicted gang members, as shown by the Guidelines Commission data, indicate that section 609.229 has a racially disparate impact.

A third concern that we have with Frazier's use of the Guidelines Commission data to construct an equal protection claim is the sample size. Between 1994 and 1998, 39 individuals were convicted under section 609.229. In other settings, courts have rejected certain statistical inferences as unreliable based on the fact that the sample size is too small. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (rejecting as "meaningless" racial composition statistics because, among other problems, the sample size was 13); *Lewis v. Aerospace Community Credit Union*, 114 F.3d 745, 750 (8th Cir.1997) (holding that where the sample size of a group in a statistical analysis is too small to be statistically significant, a plaintiff cannot rely on those statistics alone to support a claim of disparate impact); *Shutt v. Sandoz Crop Protection*

*Corp.,* 944 F.2d 1431, 1433 (9th Cir.1991) (holding that discriminatory impact based on a class of 21 employees is statistically insufficient); *Mems v. City of St. Paul— Dept. of Fire and Safety Services,* 73 F.Supp.2d 1031, 1040 (D.Minn.1999) (holding that statistical evidence based on a sample size of 10 was insufficient to prove a claim of racially motivated disparate impact). Neither party presented evidence as to whether we can draw statistically reliable inferences regarding the statute's racially disparate impact based on the sample size of the Guidelines Commission data. In addition, because Section 609.229 was enacted in 1991, we question why Frazier does not include the convictions, if any, under the statute before 1994. Therefore, we lack adequate information upon which to evaluate whether the Guidelines Commission data are sufficient to support Frazier's claim.

We have two final questions regarding the validity of Frazier's data analysis. First, we question whether it is permissible for Frazier to demonstrate disparate impact by examining the effect of section 609.229 on all minorities rather than the effect of section 609.229 on the group to which he belongs. The Eighth Circuit has held that under the Age Discrimination in Employment Act (ADEA), a disparate impact plaintiff must "demonstrate a disparate impact upon the group to which he or she belongs." *Lewis,* 114 F.3d at 750. Other federal courts have refused to permit the grouping of blacks and Hispanics for purposes of establishing disparate impact under the Civil Rights Act of 1964. *See Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir.1975); *Ramirez v. City of Omaha,* 538 F.Supp. 7, 13 (D.Neb. 1981). The parties did not address whether these principles apply in the context of a constitutionally-based disparate impact claim.

We also have a related question of whether it is statistically appropriate for Frazier to group all minorities together and compare the impact of section 609.229 on minorities as a group with whites. According to Frazier, the Guidelines Commission data indicate that 10 percent of those convicted under section 609.229 are white and 90 percent are minorities. However, an examination of the racial breakdown of those convicted of violating section 609.229 indicates that Asians are more likely than any other group to be convicted of violating section 609.229. We have a concern that grouping all minorities together may not present an accurate picture of the impact of section 609.229 on blacks. Moreover, Frazier has presented no statistical or legal authority for grouping minorities. In addition, this issue was neither briefed nor argued below. Therefore, we do not have sufficient information to evaluate whether Frazier's grouping of minorities is statistically or legally appropriate.

In sum, we have several questions regarding the reliability and validity of Frazier's data and data analysis. Because neither party presented any analysis of the data or expert testimony, we lack an adequate record to evaluate whether section 609.229 creates a race-based classification in practice. Here, it is important to note that we are not concluding that the Strike Force and Guidelines Commission data do not or cannot demonstrate disparate impact. Nor are we concluding that an equal protection plaintiff must base his claim on data that are derived and analyzed according to the best social science methods of the day. What we do require, however, is a factual record that permits us to evaluate the reliability and validity of both the data and the data analysis. We do not have such a record here. For these reasons, we hold that Frazier did not prove beyond a reasonable doubt that section 609.229 is

unconstitutional. We therefore affirm the district court's decision that section 609.229 does not deny equal protection under the Minnesota Constitution, but do so on different grounds.

## II.

■ Frazier's second argument is that section 609.229 violates the equal protection clause because Minnesota's RICO statute, Minn.Stat. § 609.901 et seq., punishes criminal intent and criminal conduct that is similar to the conduct penalized by section 609.229, but the gang statute imposes a longer sentence. More particularly, Frazier asserts that a person who violates the RICO statute falls outside the purview of section 609.229 because the enterprise would not have a common name or common identifying sign or symbol. He contends that there is no rational basis for this distinction and that those who violate the RICO statute should have the same enhanced penalty as those violating the gang statute. Frazier also contends that the only difference between a criminal gang and an enterprise is that a criminal gang has a common name or common identifying sign or symbol. Thus, an individual who commits a criminal offense for the benefit of a criminal gang is similarly situated to an individual who participates in a criminal act in connection with an enterprise.

■ The equal protection clause guarantees that similarly situated individuals receive equal treatment. *State v. Merrill,* 450 N.W.2d 318, 321 (Minn.1990). A statute violates the equal protection clause when it prescribes different punishments or different degrees of punishment for the same conduct committed under the same circumstances by persons similarly situated. *Id.* Thus, the critical inquiry is whether the elements of section 609.229 and the RICO statute are the same or essentially similar. *Id.* at 321–22.

Section 609.229 provides that:

A person who commits a crime for the benefit of, at the direction of, or in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members, is guilty of a crime.

Minn.Stat. § 609.229, subd. 2. The statute also provides that a criminal gang means "any ongoing organization, association, or group of three or more persons, whether formal or informal," that meets the following three criteria:

(1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;[3] (2) has a common name or common identifying sign or symbol; and (3) includes members who individually or

---

**3.** Section 609.11, subd. 9, lists the applicable offenses as follows:

murder in the first, second, or third degree; assault in the first, second, or third degree; burglary; kidnapping; false imprisonment; manslaughter in the first or second degree; aggravated robbery; simple robbery; first-degree or aggravated first-degree witness tampering; criminal sexual conduct under the circumstances described in sections 609.342, subdivision 1, clauses (a) to (f); 609.343, subdivision 1, clauses (a) to (f);

and 609.344, subdivision 1, clauses (a) to (e) and (h) to (j); escape from custody; arson in the first, second, or third degree; drive-by shooting under section 609.66, subdivision 1e; harassment and stalking under section 609.749, subdivision 3, clause (3); possession or other unlawful use of a firearm in violation of section 609.165, subdivision 1b, or 624.713, subdivision 1, clause (b), a felony violation of chapter 152; or any attempt to commit any of these offenses.

collectively engage in or have engaged in a pattern of criminal activity.

Minn.Stat. § 609.229, subd. 1.

Section 609.903 of the RICO statute provides that a person is guilty of racketeering if the person

(1) is employed by or associated with an enterprise and intentionally conducts or participates in the affairs of the enterprise by participating in a pattern of criminal activity; (2) acquires or maintains an interest in or control of an enterprise, or an interest in real property, by participating in a pattern of criminal activity; or (3) participates in a pattern of criminal activity and knowingly invests any proceeds derived from that conduct, or any proceeds derived from the investment or use of those proceeds, in an enterprise or in real property.

Minn.Stat. § 609.903, subd. 1.

The RICO statute defines "enterprise" as:

[A] sole proprietorship, partnership, corporation, trust, or other legal entity, or a union, governmental entity, association, or group of persons, associated in fact although not a legal entity, and includes illicit as well as legitimate enterprises.

Minn.Stat. § 609.902, subd. 3. The statute defines "pattern of criminal activity" as:

[C]onduct constituting three or more criminal acts [4] that: (1) were committed within ten years of the commencement of the criminal proceeding; (2) are neither isolated incidents, nor so closely related and connected in point of time or circumstance of commission as to constitute a single criminal offense; and (3) were either: (i) related to one another through a common scheme or plan or a shared criminal purpose or (ii) committed, solicited, requested, importuned, or intentionally aided by persons acting with the mental culpability required for the commission of the criminal acts and associated with or in an enterprise involved in those activities.

Minn.Stat. § 609.902, subd. 6.

Here, Frazier pleaded guilty to and was sentenced for second-degree controlled substance crime committed for the benefit of a gang. This crime qualifies as a predicate criminal offense under both section 609.229 and RICO. However, it is not possible to convict an individual under RICO for racketeering based on his participation

4. The RICO statute defines criminal act as:

[C]onduct constituting, or a conspiracy or attempt to commit, a felony violation of chapter 152, or a felony violation of section 297D.09; 299F.79; 299F.80; 299F.82; 609.185; 609.19; 609.195; 609.20; 609.205; 609.221; 609.222; 609.223; 609.2231; 609.228; 609.235; 609.245; 609.25; 609.27; 609.322; 609.342; 609.343; 609.344; 609.345; 609.42; 609.48; 609.485; 609.495; 609.496; 609.497; 609.498; 609.52, subdivision 2, if the offense is punishable under subdivision 3, clause (3)(b) or clause 3(d)(v) or (vi); section 609.52, subdivision 2, clause. (4); 609.527, if the crime is punishable under subdivision 3, clause (4); 609.528, if the crime is punishable under subdivision 3, clause (4); 609.53; 609.561; 609.562; 609.582, subdivision 1 or 2; 609.668, subdivision 6, paragraph (a); 609.67; 609.687; 609.713; 609.86; 609.894, subdivision 3 or 4; 609.895; 624.713; 624.74; or 626A.02, subdivision 1, if the offense is punishable under section 626A.02, subdivision 4, paragraph (a). "Criminal act" also includes conduct constituting, or a conspiracy or attempt to commit, a felony violation of section 609.52, subdivision 2, clause (3), (4), (15), or (16), if the violation involves an insurance company as defined in section 60A.02, subdivision 4, a nonprofit health service plan corporation regulated under chapter 62C, a health maintenance organization regulated under chapter 62D, or a fraternal benefit society regulated under chapter 64B.

Minn.Stat. § 609.902, subd. 4.

in just one act of second-degree controlled substance crime. Rather, the state would have to prove that the defendant participated in a pattern of criminal activity that includes three or more criminal acts. Minn.Stat. §§ 609.902, subd. 6, and 609.903, subd. 1. Therefore, Frazier, whose conviction under section 609.229 was based on the commission of one criminal offense, is not similarly situated to an individual convicted under RICO, whose conviction must be based on his participation in at least three criminal acts.

There is a further reason why Frazier is not similarly situated to an individual convicted under RICO. Criminal gangs have a common name or common identifying sign or symbol while enterprises may or may not. In addition, the commission of criminal offenses is one of the primary activities of a criminal gang, Minn.Stat. § 609.229, subd. 1(1), while enterprises may be engaged in legitimate pursuits. Therefore, an individual who commits a single offense for the benefit of a criminal gang, an entity whose primary activity is the commission of criminal offenses, is not similarly situated to an individual who participates in a single criminal act in connection with what could be a legitimate and law-abiding enterprise.

Because we conclude that Frazier is not similarly situated to someone who violates RICO, we hold that the different penalties for violations of the RICO statute and section 609.229 do not deny equal protection.

## III.

■■■ In a footnote in his brief to our court, Frazier argues that section 609.229 violates freedom of expression and association protected by the Minnesota Constitution. Frazier did not raise this issue before the district court or the court of appeals. Furthermore, neither court addressed this issue. Constitutional challenges to a statute may not generally be raised for the first time on appeal. "Where an issue of constitutionality is not raised and acted upon in the court below, a party will not be heard to raise the issue for the first time on appeal to the supreme court." *Hampton v. Hampton*, 303 Minn. 500, 229 N.W.2d 139, 140 (Minn. 1975). Therefore, we need not address Frazier's first amendment claim.

Affirmed.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. In this case, William Frazier claims that Minn.Stat. § 609.229 (2000) has a disparate impact on people of color and that, as applied to him, the statute violates the Minnesota Constitution by depriving him of equal protection of the law.[1] The court holds that the statistical evidence offered by Frazier fails to establish that section 609.229 has a disparate impact on people of color. I conclude, however, that the evidence, in the form of Minnesota Sentencing Guidelines

---

1. Frazier also claims that section 609.229 violates equal protection because the penalties it imposes for crimes committed for the benefit of a criminal gang are more severe than those imposed by Minnesota's RICO Act, Minn.Stat. §§ 609.901–.912 (2000), for participation in criminal acts in connection with an enterprise; and that the definition of "criminal gang" found in Minn.Stat. § 609.229, subd. 1 (2000), violates the United States Constitution because it classifies individuals as members of criminal gangs based on conduct that is protected by the First Amendment. Given my conclusions with respect to Frazier's disparate impact claim, it is unnecessary to address his other claims.

Commission data, does show that section 609.229 has a disparate impact both on blacks and people of color generally. Furthermore, because the classification created by section 609.229 is not genuine and relevant to the purpose of the statute, the statute does not pass constitutional muster under the Minnesota rational basis test.

## I.

The threshold legal question raised by Frazier's argument is whether Frazier, as a black man, can argue that section 609.229 has a disparate impact on *all* people of color, as opposed to just blacks. With the exception of Native Americans, for which the sample size was one, and the group, "other," which may or may not refer to a racial minority group, the application of section 609.229 similarly affects blacks and Asians, as it concerns convictions under the statute. Although Asians are more likely than blacks or whites to be convicted under section 609.229, this does not mean that a problem does not exist with respect to blacks, who are still three times more likely to be convicted than whites. The statistics show that the disparate impact alleged is a multi-ethnic problem, involving more than a one-to-one correlation between only blacks and whites. *See United States v. Bd. of Educ. of City of Chicago,* 554 F.Supp. 912, 920–21 (N.D.Ill. 1983) (applying similar analysis in grouping all minorities together to determine if schools had been satisfactorily desegregated). As such, it is appropriate in this particular context to group minorities together for the purpose of analyzing Frazier's disparate impact claim. *See Kohn v. Minneapolis Fire Dep't,* 583 N.W.2d 7, 12–14 (Minn.App.) *rev. denied* (Minn. Oct. 20, 1998) (concluding that district court did not err in grouping all minorities together because number of Hispanics affected was too small to stand alone and there was similar past history of discrimination

against other minority groups). In any event, the data presented by Frazier establishes that the statute has a disparate impact not only on people of color generally, but also on blacks. Thus, for purposes of this case, it makes little difference whether the appropriate class is defined as African Americans or people of color.

The aim of section 609.229 is to prevent and punish violent group criminal activity. However, by restricting the definition of "criminal gang" to groups that have a "common name or common identifying sign or symbol," Minn.Stat. § 609.229, subd. 1(2) (2000), the statute singles out and applies a harsher penalty to only a portion of the people who engage in violent group criminal activity. Although this definition may be race-neutral on its face, its effect has been to target people of color. In the past five months alone, this court has decided at least two criminal cases in which a white defendant was a member of a group that did not fall within the statute's definition of criminal gang merely because the group lacked a "common name or common identifying sign or symbol." *See State v. Stewart,* 643 N.W.2d 281 (Minn.2002); *McCollum v. State,* 640 N.W.2d 610 (Minn. 2002).

In *McCollum,* the defendant murdered the victim after the victim allegedly informed the police of the location of two of the defendant's associates. 640 N.W.2d at 612–17. Several of the defendant's associates were involved in the sale of illegal drugs. *Id.* at 613. One of them had been selling drugs out of the victim's house, and another had a white powdery substance in his possession when he was arrested by the police. *Id.* Before his death, the victim was severely beaten over the course of three days by a group that included the defendant and six other individuals. *Id.* at 614–15. It appears that the murder in *McCollum* was designed to encourage

compliance with the group's internal rules by driving home the message that group members must protect one another from law enforcement.

In *Stewart*, the defendant was convicted of murder for his role in the drive-by-shooting of a bicyclist on Mississippi River Boulevard in Saint Paul. 643 N.W.2d at 283–84. Two other men were in the car with the defendant when the defendant pulled the trigger. *Id.* at 285. In the weeks leading up to the shooting, the three men had agreed to commit armed robbery and murder, and had driven along the boulevard on several occasions with a loaded gun. *Id.* at 285, 288. The men used the term "first blood" to refer to the first member of the group to kill someone. *Id.* at 285. There was also evidence that the defendant and one of the men had engaged in past criminal activity together by participating in a burglary and agreeing to commit a murder for hire. *Id.* at 289–91. The fact that neither the defendant in *McCollum* nor the defendant in *Stewart* was charged with committing a crime for the benefit of a gang underscores the underinclusive nature of section 609.229 and the effect of including the "common name or common identifying sign or symbol" requirement within the definition of criminal gang.

Before examining the evidence of disparate impact presented by Frazier in this case, it should be made clear that there is an important difference between the equal protection jurisprudence developed by the United States Supreme Court through its interpretations of the United States Constitution and the approach adopted by this court under the Minnesota Constitution.

A party who challenges a statute on equal protection grounds under the United States Constitution must prove the existence of discriminatory intent or purpose. *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Discriminatory purpose, the Court has explained, implies that the state decision maker selected or reaffirmed a particular course of action at least in part "because of," and not merely "in spite of," its adverse affects upon an identifiable group. *McCleskey*, 481 U.S. at 298, 107 S.Ct. 1756. Under the federal approach to equal protection, then, a party cannot successfully challenge a statute by merely showing that it has a disproportionate negative impact on the members of a particular racial minority group.[2] *McCleskey*, 481 U.S. at 298–99, 107 S.Ct. 1756.

In *State v. Russell*, 477 N.W.2d 886 (Minn.1991), this court utilized a more protective approach under the Minnesota Constitution to strike down a facially neutral criminal statute that had a discriminatory impact on blacks. In *Russell*, five black men challenged the constitutionality of a statute that penalized the possession of crack cocaine more severely than the possession of powder cocaine. *Id.* at 887. The men claimed that the crack cocaine statute violated the equal protection guarantees of the federal and state constitutions because it had a discriminatory impact on blacks. *Id.* The men did not trace the statute's discriminatory impact to any discriminatory intent or purpose on the part of the legislature or those charged

---

**2.** This is not to say that evidence of disproportionate impact is completely irrelevant under the federal approach. *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Court has stated that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242, 96 S.Ct. 2040; *see McCleskey*, 481 U.S. at 293, 107 S.Ct. 1756.

with implementing the statute. This court analyzed the statute's distinction between possession of crack cocaine and possession of powder cocaine using the three-pronged Minnesota rational basis test. The test requires:

(1) [t]he distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs;

(2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and

(3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Russell,* 477 N.W.2d at 888. Explaining its rationale for applying the Minnesota rational basis test to the crack cocaine statute, this court stated that "[t]here comes a time when we cannot and must not close our eyes when presented with evidence that certain laws, regardless of the purpose for which they were enacted, discriminate unfairly on the basis of race." *Id.* at 888 n. 2.

Under Minnesota law, then, a defendant who challenges the constitutionality of a statute on the basis that it has a disparate impact on the members of a minority racial group is entitled to review of the statute under the Minnesota rational basis test if the defendant shows that the statute falls more harshly on one group than another. *Russell,* 477 N.W.2d at 888.[3] In this case, Frazier has presented data which shows that, over a period of five years, 30.8% of those convicted under section 609.229 are black. The data also shows that people of color account for 89.7% percent of those convicted under the statute. Because the data presented here shows that blacks are three times more likely, and that people of color generally are 8.8 times more likely, to be convicted under section 609.229 than whites, Frazier has succeeded in showing that the effects of the statute fall more harshly on blacks and people of color than whites. I do not see the point in requiring Frazier to undertake further data analyses, all for the purpose of showing what can already plainly be seen from the conviction data itself. Indeed, in its oral argument to this court, the state repeatedly conceded that the data from the Minnesota Sentencing Guidelines Commission show that the statute has a disparate impact on people of color. Having made this showing, Frazier is entitled to have this court review the statute under the Minnesota rational basis test.

The court makes much ado over the reliability of Frazier's data, namely the racial distribution of the population of confirmed gang members in Minnesota and the indicators of gang membership. Aside from the fact that the statistics concerning the racial distribution of confirmed gang members is only marginally relevant to analyzing Frazier's challenge,[4] the court fails to point out that the state does not

---

3. Disparate impact results from practices that, although neutral on their face, fall more harshly on one group than another. *Langlie v. Onan Corp.,* 192 F.3d 1137, 1140 (8th Cir. 1999); *E.E.O.C. v. Francis W. Parker School,* 41 F.3d 1073, 1076 (7th Cir.1994).

4. If the effects of section 609.229 fall more harshly on blacks and people of color than whites, then there is a disparate impact regardless of whether people of color are overrepresented in the population of individuals convicted under the statute compared to their representation in the population of confirmed gang members.

dispute the reliability or validity of this data, which it produced. Moreover, it is illogical to require Frazier to present information that would enable the court to evaluate the reliability of the indicators of gang membership, given that these are the indicators that the state currently uses, regardless of whether such indicators are, in fact, reliable. Unlike the court, I can find no reason to question what the court alternately calls the reliability and validity of this data.

In *Russell,* this court accepted data similar to Frazier's as the basis for its conclusion that the crack cocaine statute had a disparate impact on blacks. In *Russell,* the district court was presented with statistics showing that, of all persons convicted under the crack cocaine statute over a one-year period, 96.6% were black. 477 N.W.2d at 887 n. 1. If conviction statistics covering a one-year period were sufficient to establish disparate impact in *Russell,* I see no reason why conviction statistics covering a five-year period are insufficient to establish disparate impact in this case. "[T]o dictate that several must suffer discrimination before one could object * * * would be inconsistent with the promise of equal protection for all." *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (citing *McCray v. New York,* 461 U.S. 961, 965, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (Marshall, J., dissenting from denial of certiorari)).

In sum, by presenting data indicating that blacks account for 30.8% of those convicted and that people of color generally account for 89.7% of those convicted under section 609.229, Frazier has demonstrated that the statute has a disparate impact on blacks and people of color. Because Frazier has demonstrated that the statute has a disparate impact, the next step is to examine the constitutionality of the statute through the application of the Minnesota rational basis test. As this court stated in *Russell,* "[i]t is particularly appropriate that we apply our stricter standard of rational basis review in a case * * * where the challenged classification appears to impose a substantially disproportionate burden on the very class of persons whose history inspired the principles of equal protection." 477 N.W.2d at 889.

## II.

On occasion, this court has applied the three prongs of the Minnesota rational basis test in reverse order. *Kolton v. County of Anoka,* 645 N.W.2d 403, 412 (Minn.2002); *Metropolitan Sports Facilities Comm'n v. County of Hennepin,* 478 N.W.2d 487, 489 n. 4 (Minn.1991). I believe that it is appropriate to employ this approach here. Thus, the first question is whether the purpose of the statute is one that the state may legitimately attempt to achieve. *Metropolitan Sports Facilities Comm'n,* 478 N.W.2d at 489 n. 4; *Guilliams v. Comm'r of Revenue,* 299 N.W.2d 138, 142 (Minn.1980). According to the state, the purpose of section 609.229 is to prevent and enhance the penalty for group criminal activity. The state cites legislative history showing that the legislature enacted the statute to counter the increase in violent criminal street gang activity. The state also notes that the Hennepin County Attorney's Office was forced to dismiss felony charges in three cases during 1990–1991 after key witnesses were threatened by criminal gang members.

It is beyond dispute that the state may act to provide for the security, benefit, and protection of the people by prohibiting conduct that is detrimental to public safety. *See* Minn. Const. art. 1, § 1 ("Government is instituted for the security, benefit and protection of the people * * *."); *Russell,* 477 N.W.2d at 891 (stating that

penalizing and eradicating drug dealers is a legitimate state purpose); *State v. Vernon*, 283 N.W.2d 516, 519 (Minn.1979) (stating that criminalizing possession of cocaine is a legitimate state purpose). As such, the purpose of section 609.229 is one that the state may legitimately attempt to achieve.

The second question is whether the classification created by the statute is genuine or relevant to its purpose; that is, whether there is an evident connection between the distinctive needs peculiar to the class and the prescribed remedy. *Russell*, 477 N.W.2d at 888; *Guilliams*, 299 N.W.2d at 142. The classification at issue in this case is created by the following definition of "criminal gang" set forth in section 609.229, subdivision 1:

> As used in this section, "criminal gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, that:
>
> (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;
>
> (2) has a common name or common identifying sign or symbol; and
>
> (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

This provision draws a distinction between groups that fall within the definition of criminal gang and groups that would fall within the definition but for the lack of a common name or common identifying sign or symbol. Rephrasing the second prong of the Minnesota rational basis test to fit the particular circumstances of this case, the inquiry is whether the statute's exclusion of groups that lack a common name or common identifying sign or symbol from the definition of criminal gang is genuine or relevant to its purpose of preventing and penalizing violent group criminal activity.

The state contends that the classification is genuine or relevant because common names and common identifying signs and symbols lie at the heart of what it means to be a criminal gang. Citing a commentator, the state notes that "[v]isual presence is very much a part of the gang ambiance. Gang colors, jackets, or other distinct articles of clothing, hairstyles, and distinctive manners all provide objective positive evidence marking members of criminal street gangs." There is no evidence before us indicating the presence of a relationship between an individual's style of dress, hairstyle, or "distinctive manners" and their propensity to engage in violent group criminal activity. Moreover, the legislature has explicitly rejected the idea that physical appearance, rather than conduct, can be used to identify criminal gang members. *See* Minn.Stat. § 299A.64, subd. 2 (2000) (requiring the criminal gang oversight council to develop a strategy to eliminate the harm caused by criminal gangs and providing that the strategy "must target individuals or groups based on their criminal behavior, not their physical appearance"). By identifying certain physical characteristics as indicators of criminal gang membership, the state's argument unfairly stigmatizes and casts suspicion on individuals who possess those characteristics but are not members of criminal gangs.

The state's suggestion that common names or common identifying signs or symbols are somehow unique to criminal gangs is also unconvincing. There are countless law-abiding business, political, educational, social, religious, sports, and other organizations throughout the state that have common names or common identifying signs or symbols. Thus, it cannot be said that those who fall within the

challenged classification are more likely to participate in the conduct proscribed by section 609.229 than those who do not.

Furthermore, by requiring that criminal gangs have a common name or common identifying sign or symbol, section 609.229 embraces some individuals who participate in violent group criminal activity but excludes others. The previous discussion of our decisions in *McCollum* and *Stewart* demonstrates that section 609.229 is underinclusive. The purpose of the statute is not served by punishing Frazier, who sold drugs to a police informant for the benefit of a group that falls within section 609.229's definition of "criminal gang," more severely than the defendants in *McCollum* and *Stewart*, both of whom committed violent first-degree murder for the benefit of a group that has all of the ingredients of a criminal gang except a common name or common identifying sign or symbol. The groups involved in this case, in *McCollum*, and in *Stewart*, are all quite similar in terms of their participation in the kind of conduct that section 609.229 was designed to prevent. Indeed, the group in *McCollum* participated in the same type of criminal activity—the sale of illegal drugs—as the group to which Frazier belonged. Because Frazier is similarly situated to the defendants in *McCollum* and *Stewart*, they should all be treated alike under the law. *See State v. Merrill*, 450 N.W.2d 318, 321 (Minn.1990) ("The equal protection clause of the Fourteenth Amendment requires that all persons similarly situated be treated alike under the law."); *In re Harhut*, 385 N.W.2d 305, 310 (Minn.1986) ("The equal protection clauses of the federal and state constitutions require that all persons similarly situated be treated alike under the law."). Yet section 609.229 distinguishes between them and imposes an enhanced penalty on just one of them.

The state also argues that groups that have a common name or common identifying sign or symbol are more cohesive than other groups, and that this cohesiveness enables criminal gangs to grow into sophisticated criminal enterprises. As illustrated by *McCollum*, however, groups involved in criminal activity can employ other methods of securing the allegiance of their members. In that case, the group employed violence and, ultimately, murder as a means of enforcing group cohesiveness. In addition, the state's assertion that groups that have a common name or common identifying sign or symbol are more cohesive than those who do not is not accompanied by any citation to the legislative history that would indicate that the legislature had the cohesion or sophistication of criminal groups in mind when it created the classification. More fundamentally, there is no evidence in the record to support the proposition that having a common name or common identifying sign or symbol fosters cohesiveness or enhances a group's level of sophistication. In short, there is no basis in the record on which to conclude that limiting the application of section 609.229 to individuals who commit crime for the benefit of a group that has a common name or common identifying sign or symbol is genuine or relevant to the purpose of preventing group criminal activity.

The fact that section 609.229 takes only a partial step toward the fulfillment of its objective usually would not warrant a conclusion that the law is unconstitutional. Indeed, we generally will not hold a statute unconstitutional "merely because it does not assure complete amelioration of the evil it addresses." *Mack v. City of Minneapolis*, 333 N.W.2d 744, 751 (Minn. 1983); *see Federal Distillers, Inc. v. State*, 304 Minn. 28, 43–44, 229 N.W.2d 144, 156 (1975). However, this principle does not apply when, as here, the partial step taken

by the legislature has the effect of singling out people of color and subjecting them to enhanced criminal penalties. Because Frazier has sustained his burden of establishing beyond a reasonable doubt that section 609.229 has a disparate impact on blacks specifically and people of color generally and, because the classification created by section 609.229, subdivision 1, is not genuine or relevant to the statute's purpose, section 609.229, as applied to Frazier, is unconstitutional. I would therefore remand the case to the district court for resentencing with the instruction that Frazier's sentence shall not be enhanced pursuant to Minn.Stat. § 609.229, subd. 2 (2000).